GENERAL ELECTRIC COMPANY, Plaintiff, *v.* R. H. MACY & CO., INC., Defendant.

Supreme Court, Special Term, New York County, January 16, 1951.

*Thomas Kiernan* and *Edgar Barton* for plaintiff.

*Kenneth M. Spence* and *James A. Halpin* for defendant.

GREENBERG, J. This is an action by General Electric Company under the Fair Trade Law, also known as the Feld-Crawford Act (General Business Law, § 369-a *et seq.*), to enjoin R. H. Macy & Co., Inc. (hereinafter referred to as '' Macy ''), from selling certain General Electric appliances below the minimum prices fixed by General Electric in its fair-trade agreements.

A preliminary injunction in this action was granted on April 27, 1950, and is still in effect (N. Y. L. J., April 20, 1950, p. 1393, col. 3).

The plaintiff General Electric is a manufacturer of electrical appliances which bear its trade name. The defendant Macy operates a large department store which sells electrical appliances at retail.

Macy admits its sales of General Electric appliances at prices below the fair-trade prices. Its chief defenses are:

(1) General Electric has waived and abandoned the benefits of the Fair Trade Law by failing to restrain widespread price cutting by other retailers.

(2) General Electric does not come into court with clean hands and should not be given relief because (a) It has discriminated in the enforcement of fair-trade prices and has not enforced them equitably. (b) Its wholly owned subsidiary has sold appliances at retail below the fair-trade prices.

Upon the trial of this action which lasted for seven weeks both sides adduced voluminous evidence as to the extent of price cutting on General Electric appliances and as to the degree of enforcement by General Electric. Both sides also submitted extensive memoranda on the points of law involved and the facts.

It appears from the evidence at the trial that General Electric merchandises its appliances in the New York metropolitan area through a number of franchised distributors including General Electric Supply Corporation, a wholly owned subsidiary. These distributors in turn sell to approximately thirty-five hundred retail dealers through the area. In 1946 and 1947 General Electric entered into fair-trade agreements with some of its distributors. It then established an enforcement committee at its offices in Bridgeport, Connecticut, to supervise the enforcement of these agreements. The enforcement for the most part consisted of receiving and investigating complaints, sending out registered letters to violators and, if continued violations were found, starting legal suits.

Sometime in 1948, the evidence discloses, certain so-called "discount houses" were found to be violating the fair-trade prices on General Electric appliances. These discount houses operate by issuing cards to special groups, such as employees of large business organizations, entitling the holders to discounts on all articles purchased. In March, 1948, General Electric brought suit against two of the leading discount houses and eight other retailers to enjoin fair-trade price violations. It obtained injunctions against them and thereafter brought actions to punish certain of these retailers for contempt.

In December, 1948, Macy made a complaint to General Electric regarding fair-trade price violations by discount houses. Macy, in its letter to General Electric, enclosed articles appearing in a trade publication setting forth the operations of these discount houses and the sale by them of General Electric and other appli-

ances at discounts. General Electric's reply as to its enforcement activities apparently satisfied Macy at that time.

In November, 1949, General Electric entered into an agreement with the two leading discount houses mentioned above to vacate the temporary injunctions obtained against them in return for consent judgment to be entered against them in case of future violations. The evidence indicates that the discount houses subsequently continued violations and that there was no considerable activity on the part of General Electric to combat these violations.

On March 6, 1950, in an effort to stimulate General Electric's enforcement activities and to end its own competitive disadvantage in relation to discount houses, Macy cut prices on two General Electric appliances. There followed conferences between General Electric and Macy representatives, and Macy restored fair-trade prices until March 23d, when it notified General Electric that it intended to resume cutting prices on General Electric appliances. It thereafter again sold two General Electric appliances at cut prices until April 6, 1950, when a restraining order was served upon it.

General Electric then began a very active and vigorous enforcement drive, spearheaded by this present action against Macy. Since March, 1950, General Electric has brought over one hundred fifty actions against retailers to enjoin sales below fair-trade prices and in nearly every instance obtained either consent judgments or orders by the court enjoining the violators. In April, 1950, it entered consent judgments against the two large discount houses referred to above. In May, 1950, it cancelled the distributorship franchise of its wholly owned subsidiary, General Electric Supply Corporation, as a result of disclosures in *General Elec. Co.* v. *Maritime Watch & Jewelry Co.* (N. Y. L. J., May 3, 1950, p. 1570, col. 7), that the subsidiary had made a sale to a New York City fireman at a discount from the fair-trade price. Since that time, General Electric has also brought a very large number of contempt proceedings to punish violations of injunctions.

While this current enforcement campaign was provoked by Macy's challenge in cutting prices, it is clearly no mere facade to serve as a background for this case but, rather, a widespread and determined attempt to wipe out price cutting in this area.

Macy urges that this court should not grant General Electric relief:

(1) Because General Electric has failed to enforce its fair-trade prices effectively, with the result that widespread price cutting exists and will continue. Macy contends specifically that the following inadequacies exist in General Electric's enforcement procedure: (a) General Electric maintains no policing staff; (b) The enforcement committee located in Bridgeport has a passive procedure and does not investigate violations efficiently; (c) General Electric's system of doing business through distributors who compete with each other for the business of retail dealers, fosters price cutting and prevents the enforcement of fair-trade prices; and (d) General Electric has failed to require distributors to cut off the supply to violating dealers.

(2) Because such enforcement as has been carried on by General Electric has been discriminatory. Macy contends that General Electric enforced fair-trade prices against department stores but allowed violations by discount houses and others who did not display cut prices publicly, with the result that Macy is at a competitive disadvantage and its good will has been injured.

(3) Because a wholly owned General Electric subsidiary has made sales below fair-trade prices.

Macy further urges that the increased enforcement activity on the part of General Electric since the commencement of this action should not even be considered by this court because General Electric should not be allowed to purge itself during the course of this action.

The determination of the validity of these objections requires some reference to the underlying statute and the cases decided thereunder.

The Fair Trade Law is, in effect, a general statement of policy sanctioning vertical price fixing of commodities bearing the mark of the producer. It makes actionable in the courts, as unfair competition, any sales at prices below those fixed in accordance with the Fair Trade Law. This general statement of policy has been left on the doorstep of the courts without benefit of administrative protection or rules and regulations for its development. While the advantages and disadvantages of this policy have been the subject of much controversy, the policy having been enacted into law in this State, it is the duty of the courts to interpret and enforce it so as to carry out the purposes of the Legislature. The chief purpose of the statute is expressed as being to protect a producer against injury of his good will, resulting from price cutting of goods bearing his trade-mark. There are also expressed objectives as to the

protection of distributors of these goods and the public. (General Business Law, § 369-a; *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U. S. 183; *Guerlain, Inc.*, v. *Woolworth Co.*, 297 N. Y. 11; *Port Chester Wine & Liquor Shop* v. *Miller Bros. Fruiterers*, 253 App. Div. 188.)

The courts on the whole have enforced the statute vigorously. In the absence of statutory standards, they have imposed equitable safeguards designed to ensure the functioning of the statute for the purposes expressed by the Legislature. The first requirement for enforcement is an obvious and basic one: that there be a fair-trade price structure which has a real and not merely a " paper " or " illusory " existence. The second, which is closely related, is that there has been reasonable and diligent enforcement of the existing fair-trade prices. The third is that the relief sought be for the sole purpose of enforcement and not for any ulterior purposes. Finally, the courts, as in all equitable cases, retain the power to refuse relief where the plaintiff has indulged in any practices offensive to the conscience of the court. (*American Safety Razor Corp.*, v. *International Safety Razor Corp.*, 26 F. 2d 108.)

Where there is in fact no existing price structure to protect, the courts have refused to grant relief. Thus, in *Automotive Elec. Service Corp.*, v. *Times Square Stores Corp.* (175 Misc. 865) the court denied an injunction where it found that price cutting had been so general and long continued that sales on the market at fair-trade prices were unusual. The court found that the continuance of this condition, without any action on the part of the manufacturer or the plaintiff, was to be regarded as a waiver or abandonment of rights under the Fair Trade Law. The purpose of enforcement, the court noted, was to maintain an existing price, not to establish a nonexistent one.

Again, in *Ray Kline, Inc.*, v. *Davega-City Radio* (168 Misc. 185) the court refused an injunction where it found that efforts to enforce fair-trade prices on radios had failed utterly and that the industry was in a chaotic and demoralized state. The result was that there was a disregard of all list prices for radios and, in effect, a collapse of the whole fair-trade price structure. The court pointed out in its decision that a temporary injunction against the defendant would be of little aid to the plaintiffs and might work irreparable harm on the defendants under the circumstances.

The second requirement is that the fair-trade prices be enforced reasonably and diligently. This requirement and the

above-discussed first requirement are often expressed in terms of waiver and abandonment. In establishing this requirement the courts have held that it is not necessary that there be simultaneous enforcement against all violators nor that the price structure be perfect. (*Ronson Art Metal Works* v. *Rothman,* N. Y. L. J., Oct. 10, 1949, p. 779, col. 7; *Sunbeam Corp.* v. *Masters, Inc.,* CCH Trade Regulation Service, par. 62,653; *General Elec. Co.* v. *Crown Nat. Corp.,* N. Y. L. J., April 28, 1950, p. 1509, col. 4.) This requirement is discussed by the court in *Calvert Distillers Corp.* v. *Nussbaum Liquor Store* (166 Misc. 342). There, the court laid down the principle that in order to avail himself of the benefits of the statute, the producer or plaintiff must make a sincere and diligent effort to prevent price cutting of branded products, through legal process if necessary. The court also laid down the corollary principle that a retailer may not take advantage of an alleged breach of contract unless the violation amount to an improper discrimination, unfair business practices, or indicate an acquiescence in unlawful cutting of prices or a waiver or abandonment of a producer's rights under the statute.

The third requirement is that the relief be sought for the sole purpose of carrying out the intent of the act. Where the facts are established that the relief is sought for ulterior purposes, such as reserving a lucrative retail market for the producer, discriminating in favor of certain retailers as against others, or obtaining a competitive advantage, the courts have denied relief. (*Gillette Safety Razor Co.* v. *Green,* 167 Misc. 251; *Fogel* v. *Bolet,* 194 Misc. 1019; *Weisstein* v. *Corbyon Liquor Store,* 174 Misc. 1075.)

These principles are not absolute nor are they applied mechanically by the courts. They are, rather, applied in the light of the facts of each case and in order to attain the objectives of the statute and an equitable result between the parties. The evidence in this case establishes that there was a fair-trade price structure on General Electric appliances in existence. While it was not a perfect price structure, the facts failed to show any general breakdown or collapse.

Macy argues that there was "widespread" price cutting; however, counsel for Macy has conceded that when he spoke of "widespread" price cutting, he meant "widespread" among those favored groups having access to discount houses and not "widespread" as to the average retail purchaser. The evidence does show that there were violations in the segment of the

retail trade represented by discount houses. There is also evidence of some price cutting after March, 1950, by small independent retailers about which Macy states it is not concerned. This latter evidence is in the form of reports of shoppings made by Macy shoppers and General Electric shoppers after Macy cut prices in March, 1950. The extent of these violations as shown by Macy shoppings is much greater than those shown by General Electric shoppings. However, this is undoubtedly due in part to the fact that Macy's shoppers resorted to spurious devices calculated to entice even dealers who showed a reluctance to break the law, into price cutting. An average shopper would not shop in this manner, and the results of Macy's shoppings cannot therefore be regarded as a true gauge of the extent of price cuttings by independent retailers. Such price cutting as did exist did not reflect any general collapse of the price structure as was present in the *Automotive Elec. Service Corp.* case and the *Kline* case, discussed above.

The facts relating to the enforcement activities of General Electric can best be considered in relation to two separate periods. The first period covers the time up until March, 1950, when Macy cut prices. The evidence shows that during this early period the enforcement program of General Electric was a limited one, marked by only sporadic enforcement drives. The committee charged with enforcement was located outside of the New York area and, on the whole, took the passive role of awaiting complaints forwarded to it. General Electric did bring legal action in 1948 against some of the discount houses which were cutting prices on its appliances and obtained injunctions against them. Its efforts were not, however, sustained and continued ones and were not effective in ending the violations by discount houses. As a result, Macy, which maintained fair-trade prices, was put at a competitive disadvantage as to persons who had access to discount houses. The evidence does not show that General Electric acquiesced in or approved price cutting by discount houses, nor does it show that General Electric had any plan or purpose of discriminating in its enforcement against Macy and other department stores, and in favor of discount houses. The evidence indicates, rather, that General Electric's enforcement activities against discount houses during this early period were characterized by the same lack of an active and sustained effort as characterized its enforcement activities generally.

This continued competitive disadvantage finally led Macy to force the issue of obtaining more effective General Electric enforcement by cutting prices itself. This price cutting by Macy initiated the second period of enforcement. General Electric, responding to this challenge to its fair-trade price structure, undertook a vigorous enforcement campaign which is still continuing. As outlined above, since March, 1950, this program has included over one hundred fifty enforcement actions, many contempt proceedings, the cancellation of the distributorship franchise of General Electric Supply Corporation for price cutting, and the entry of consent judgments against two leading discount houses. These activities have borne fruit. More than one hundred dealers who have violated at one time, have ceased violating according to the shoppings of both General Electric and Macy, and more than one hundred and twenty-five additional dealers according to General Electric shoppings which were later than Macy shopping.

Macy contends, however, that even the present enforcement program of General Electric is still ineffective and inadequate; that price cutting continues; that General Electric can enforce fair-trade prices only by maintaining a policing force, changing its present method of merchandising through competitive distributors having quotas to meet, and by requiring distributors to refuse to sell to violators. The precise elements of an adequate enforcement program are not prescribed by law. Enforcement activities may take such form as is called for by the nature of the product, the industry, and the violations by the retailers, providing they add up to a reasonable and diligent effort in the light of all the facts.

There is no requirement of law that General Electric maintain a special policing staff. It may divide policing activities among its regular staff. Nor is there any requirement that General Electric change its system of merchandising through distributors. Similarly, there is no requirement that General Electric enter into agreements with distributors to cut off violators. Indeed, the latter course may involve General Electric in a violation of the antitrust laws. (*Fashion Originators' Guild of America* v. *Federal Trade Comm.*, 312 U. S. 457; Callmann on Unfair Competition and Trade-Marks [2d ed.], pp. 507, 671.) The policy of the Fair Trade Law allowing vertical price fixing runs directly counter to the policy of the antitrust law and the common law. It represents a small area situate in otherwise prohibited territory. Provisions for

enforcement are contained in the statute. To go beyond the limits of the statute for enforcement would be to tread on dangerous ground.

The present vigorous enforcement drive being carried on by General Electric is, in the opinion of this court, all that would be required of General Electric under the Fair Trade Law to enable it to enforce its agreements. Furthermore, the scope of the present drive appears able to contain and control any current price cutting.

Macy raised the further objection that this court should not take into consideration the enforcement activities of General Electric after the commencement of this action. It bases this objection on the ground that General Electric comes into court with unclean hands in that in fact there was no enforcement at all until commencement of this suit, that its early enforcement was discriminatory and that its own subsidiary cut prices. As has been determined above, the evidence does not show that the enforcement activities of General Electric were discriminatory and intended to favor discount houses as against department stores. The evidence does, however, establish that General Electric Supply Corporation did grant discounts on a number of occasions. General Electric submitted evidence that one instance of such price cutting was brought to light in May, 1950, in *General Elec. Co.* v. *Maritime Watch & Jewelry Co.* (N. Y. L. J., May 3, 1950, p. 1570, col. 7, *supra*); that an investigation by General Electric then disclosed that there had been other instances of such sales to city employees and employees of large industrial firms; that General Electric had no previous knowledge of this price cutting and that, upon learning of it, it immediately cancelled the distributorship franchise of this subsidiary for these activities. General Electric should clearly have kept itself informed of the activities of its subsidiary. Its failure to do so again appears to have been in line with its general laxness in the early period rather than the result of any design on its part for ulterior purposes.

The bar of unclean hands is one applied in the discretion of the court (*Johnson* v. *Yellow Cab Tr. Co.*, 321 U. S. 383, 387–388). While the failure to keep itself closely informed as to the activities of its subsidiary was a serious fault on the part of General Electric, as was the sporadic and lax nature of its early enforcement program, they are not so unconscionable as to require a court to bar General Electric from coming into court. In this case the interests of the parties and public policy

will be best served by not imposing such a bar but, rather, by considering all the facts and granting relief designed to safeguard the best interests of the parties and the public. (Chafee, Equity and Unclean Hands, 47 Mich. L. Rev. 877, 1065, 1095.)

It is a well-established principle that, in the absence of a bar of unclean hands, a court of equity will look to the whole situation, continuing down to the date of the decree, and adapt relief to the conditions existing at that time. (*Haffey* v. *Lynch,* 143 N. Y. 241; *Fults* v. *Munro,* 202 N. Y. 34.) Stated differently, where the defense of unclean hands is made, if the grounds for such charge are removed even after commencement of the action, plaintiff will be accorded relief against the violator. Such a course is necessary to an early determination of the issue and the rights of the parties. (*Campbell* v. *Mueller,* 159 F. 2d 803; *Westinghouse Elec. Corp.* v. *Bulldog Elec. Products Co.,* 179 F. 2d 139; *Sylvania Ind. Corp.* v. *Visking Corp.,* 132 F. 2d 947.) It would be abortive indeed for this court to reject consideration of all facts arising after the commencement of this action and thus require the parties immediately to commence another action to examine those facts, particularly since they are already in the possession of this court. Furthermore, the consideration of the whole course of conduct of the parties up to the time of the decree is necessary to enable the court to render an equitable and effective decree. Bearing in mind the course of General Electric's conduct over the entire period, it appears that in the early period it was at fault in failing to pursue a more active and particularly a more sustained enforcement program. In the later period, stimulated by the challenge to its whole fair-trade price structure, General Electric did institute a vigorous and adequate enforcement program which it is still continuing.

The question is whether the early lapse by General Electric from vigorous enforcement should act as a forfeit and bar it for all time from enforcing its fair-trade agreements. The adoption of such a principle would not carry out the purpose of the Legislature, but would make the maintenance of fair-trade price structures extremely difficult. Nor would such a decision serve the best interests of the parties in this action. The preservation of the fair-trade price structure in this case, provided it is reasonably and diligently enforced, would carry out the legislative policy and preserve the rights of General Electric in protecting its good will, while at the same time not prejudicing the rights of Macy in any way. Macy did not object to the

maintenance of fair-trade prices; on the contrary, the evidence shows it maintained such prices scrupulously for a long period of time, even when the discount houses were cutting prices. What Macy did object to was the ineffective enforcement which allowed the less conscientious discount houses to cut prices and thus put Macy at a competitive disadvantage. The evidence shows that even the price cutting by Macy was not an attempt to destroy the fair-trade price structure but, rather, to require General Electric to enforce this structure effectively or abandon it. There is no doubt that Macy suffered a real economic disadvantage and made the decision to force the issue by cutting prices in complete good faith. General Electric has responded with a vigorous enforcement program which leaves no doubt as to its will to enforce its fair-trade prices against all violators. The question in this case, therefore, is not primarily a question of right or wrong. Neither of the parties has engaged in any unconscionable activities. The question is, rather, one of working out an equitable adjustment of a business relationship.

To refuse an injunction in this case would result in irreparable injury to General Electric, since it would in effect render all of its existing fair-trade agreements unenforcible and would result in the collapse of its existing price structure. To grant an injunction, providing the fair-trade agreements are fairly and effectively enforced, would work no hardship on Macy. In the interest of an equitable solution, therefore, an injunction will be granted to the plaintiff, conditioned on the continuation by it of its present vigorous enforcement activities. This condition is intended to give Macy the greatest possible protection against any further detriment resulting from a future lapse by General Electric. The conditioning of an injunction on future behavior of the plaintiff has been employed by the courts as an effective and advisable way of giving the plaintiff relief while at the same time protecting the defendant against any future lapses in conduct by the plaintiff. (*Sylvania Ind. Corp.* v. *Visking Corp., supra; Clark* v. *Clark,* 25 Barb. 76; *Fishman* v. *Kaye,* CCH Trade Regulation Service, par. 62,718 [N. J.].)

While this court will not attempt to set forth in detail the requirements of a satisfactory future enforcement program, or a program generally to entitle a plaintiff to the protection of the Fair Trade Law, certain basic essentials are emphasized by the facts of this case. General Electric, as any other manufacturer or producer, should:

(1) Keep itself informed as to price-cutting activities and other trends generally known in the industry or trade.

(2) Close scrutiny should be kept over prior violators and appropriate action taken where indicated.

(3) Investigate and follow up complaints vigorously.

(4) Enforce fair-trade prices by repeated legal action if necessary.

(5) The enforcement program must be a continuing and sustained one.

Judgment is directed in favor of the plaintiff in accordance with this opinion against the defendant Macy and the other defendants remaining in the case on their stipulations. Findings of fact and conclusions of law are unnecessary by this decision. Settle judgment.