**CIBA PHARMACEUTICAL PROD-UCTS, Inc., Plaintiff,**

v.

**TOWNS & JAMES, Inc., Defendant.**

Civ. No. 14326.

United States District Court, E. D. New York.

July 19, 1954.

Appleton, Rice & Perrin, New York City, for plaintiff.

Rogers, Hoge & Hills, New York City, for defendant.

GALSTON, District Judge.

The action by plaintiff, a manufacturer of pharmaceutical drugs, is to enjoin the defendant, a wholesale drug company, from advertising and selling the plaintiff's drug products at prices below those established in accordance with the plaintiff's wholesale fair trade contracts entered into pursuant to the Feld-Crawford Fair Trade Act of New York, §

369–a et seq., General Business Law, McK.Unconsol.Laws, c. 20.

The defendant has moved to dismiss the action and for summary judgment. The plaintiff in turn has moved for summary judgment, and in the alternative for a temporary injunction. Both sides have submitted affidavits in support of their respective contentions. Defendant has also submitted the deposition of Vincent A. Burgher, vice-president of the plaintiff, in support of its motion. Both motions will be disposed of in this opinion.

The action was instituted in the Supreme Court of the State of New York, Kings County. On the petition of defendant it was removed to this court on the ground of diversity of citizenship, the plaintiff being a New Jersey corporation, and defendant being a New York corporation having its principal place of business in Brooklyn. Plaintiff's motion for a preliminary injunction was pending at the time.

In February, 1950, plaintiff negotiated contracts with most of the drug wholesalers in the country, including the defendant, establishing minimum wholesale prices on all of plaintiff's products except hormones. At the time the wholesalers were also asked to sign a "Wholesale Distributors' Agreement". A schedule of prices was forwarded to each wholesaler setting forth minimum prices for each of plaintiff's products. In addition, this schedule carried the notice that it was not applicable to sales in excess of $50. The wholesale distributors' agreement referred to provided, among other things, that the wholesale distributor would be allowed a 20% discount from the trade list price established by the plaintiff manufacturer as set forth in this schedule of minimum prices.

During this period plaintiff also sold its products directly to a selected group of retailers for the list price less a discount of 20%. Thus plaintiff sold its products to the wholesalers and directly to those retailers at the same price. However, since plaintiff's wholesale fair trade contracts did not apply to sales by its wholesale distributors in excess of $50 list price, the wholesalers could grant on such sales any discount they desired in selling to retailers. The affidavit of W. Rutherford James, president of defendant corporation, states:

"Of course, Towns & James did not sell Ciba products for the same price we paid for them. But where a customer wanted to purchase Ciba products in quantities of fifty dollars or more, we were able to sell him at a discount of from ten to fifteen per cent. Because of the service and credit we extend to our customers, they were willing to buy from us at the discounts we offered rather than order from Ciba at their full discount of 20% off list price."

On June 29, 1953 plaintiff announced a change in its sales policy. In a letter to its wholesale distributors, a copy of which is attached to defendant's motion papers, it announced that on July 1, 1953 it was establishing minimum prices for all of its products. At the same time it solicited new manufacturer-wholesaler fair trade contracts, since the 1950 contracts terminated on June 30, 1953. The June 29th letter was accompanied by a copy of the new fair trade contract, and a revised and complete schedule of minimum wholesaler fair trade prices. It is significant that this new schedule omitted the following statement which appeared in the earlier 1950 schedule:

"Products as set forth in this schedule shall be sold in dozens or fractions thereof, or by the unit in any quantity up to fifty ($50) dollars 'trade list price', at a price which shall be not less than the indicated list price thereof."

The defendant executed the new fair trade contract, effective July 1, 1953, with the plaintiff.

On July 28, 1953 the plaintiff issued a letter to its wholesale distributors which, among other things, stated as follows:

"3. The minimum wholesale selling price, irrespective of quantity, for your shipments of Ciba special-

ties to druggists, is the 'price to retailer' as set forth in the wholesale price catalogue sheet issued by Ciba, less a discount of not more than 2%.

"4. For years we have extended to drug retail distributors a service allowance of 20%. On July 1, 1953, this special service compensation to drug retail accounts, including Chains, was reduced to 15% instead of the former 20%."

The critical effect of the plaintiff's new sales policy with respect to its wholesale distributors, and to its direct retail accounts, was that the wholesale distributors, although obtaining a 20% discount in purchasing from the plaintiff, were required to sell plaintiff's products to retailers at the list prices established by the plaintiff, whereas the plaintiff was able to sell its products directly to its retail accounts at the list price less 15%.

Following plaintiff's institution of its new sales policy, the defendant's sales of the plaintiff's products declined. Defendant attributed its difficulties in selling plaintiff's line of products to the new policy and endeavored to obtain relief from the plaintiff. Its talks with the plaintiff's officers being unsuccessful, defendant notified plaintiff that it was cancelling its fair trade contract. After the cancellation became effective on February 19, 1954, defendant reverted to its sales policy with respect to plaintiff's products that had been in effect prior to July 1, 1953. On orders for less than $50 defendant continued to charge full list price, as set forth in plaintiff's price schedule, but on orders in excess of $50, defendant gave discounts to retailers up to 15% of list price.

Thus the affidavit of W. Rutherford James, president of the defendant corporation, admits the advertising and selling of plaintiff's trademarked products by defendant at wholesale prices below plaintiff's fair trade wholesale prices. Defendant contends, however, that plaintiff is not entitled to an injunction, or to any relief under the Fair Trade statute, because plaintiff's new policy of selling its products directly to retailers at 15% less than the established wholesale prices constitutes an acquiescence on its part in price cutting of its products, and results in unfair competition with its own wholesale customers.

The facts on this vital issue are not in dispute. The plaintiff readily admits to a policy, instituted in July, 1953, to increase its direct retail accounts up to a maximum of 10,000 retail pharmacies from its then total of some 4,000 accounts. That its efforts in this connection were highly successful is indicated by the fact that the number of direct accounts has been increased from approximately 4,000 to 8,000 accounts.

Plaintiff contends, however, that its policy with respect to sales to wholesalers was arrived at wholly separate and apart from its policy with respect to sales to retailers. It refers to a study of more than a year's duration, conducted by its market research division and by outside consultants, of the problem of obtaining better distribution by itself at the retail pharmacy level. Reference is made to the "unanimous conclusion" that plaintiff should increase its direct retail accounts to a maximum of 10,000 to obtain adequate distribution for its products at the retail level. Nothing is said, however, with respect to the conclusions or recommendations made as to means to implement this increase. It is stated that this study concluded that a reduction of "service allowance" to the direct retail accounts from 20% to 15% would still leave these accounts a fair profit margin. One cannot help observing that it is difficult to see how allowing a smaller discount to retailers would serve to attract more retail accounts.

As to plaintiff's new sales policy with respect to its wholesale distributors, the affidavit of Vincent A. Burgher, its vice president, states that the reason for eliminating the $50 list price exemption in the fair trading at wholesale level was because during the six months preceding July 1, 1953, plaintiff had received com-

plaints from wholesale accounts that the effect of the exemption was to force these wholesalers to sell plaintiff's products at a loss. The Burgher affidavit quotes from a letter dated June 22, 1953, received by the plaintiff from a wholesale account—but without identifying the sender by name—stating that the sender discovered that the "extreme discount" of 15% was being offered to retailers by competing wholesale distributors which "almost eliminates the possibility of making an operating gross profit whenever $50.00 orders are involved."

The Burgher affidavit states that prior to July 1, 1953, plaintiff's sales representatives throughout the country had received many requests from retail pharmacies to be placed on plaintiff's direct account list.

To say that a retail pharmacy, in determining from whom to buy, would not take into account the fact that it could buy plaintiff's products directly from the plaintiff at a price 15% less than that at which it could purchase the same products from a wholesale distributor of plaintiff's products, is to be blind to business realities. Aside from this price differential, and an alleged service charge which plaintiff contends it is able to render but the wholesalers are not so able to do, the plaintiff has failed to demonstrate any substantial advantage to the retail pharmacy in dealing directly with the plaintiff rather than through its wholesale distributors. Moreover, although plaintiff calls attention to complaints from its wholesale distributors, there is reason to doubt that plaintiff in fact placed much significance on such complaints in its decision to establish a new sales policy. Burgher, plaintiff's vice president in charge of its sales department, makes the following significant statement in his affidavit:

"Had I known at the time that there would be strenuous objection on the part of some responsible wholesalers to the elimination of the so-called $50 exemption, I would, as a matter of hindsight, have made a more careful record of the complaints received by Ciba regarding such exemption. At the time, however, it seemed to me quite obvious that all responsible wholesalers would welcome this change in our fair trade policy at the wholesale level because it would insure their making a reasonable profit on Ciba merchandise."

Such a conclusion is far from convincing as, of course, appears from the defendant's decision to cancel its contract as well as from the affidavits of the officers of wholesalers Fox-Vilet Drug Co., Brunswick Drug Company, Durr Drug Company, and The Kauffman-Lattimer Co. There is nothing to indicate that plaintiff instituted an investigation following the receipt of these complaints. This is pertinent because, as pointed out in the James affidavit, competition on the wholesale level is by no means confined (restricted) to that among "full line wholesalers" who have fair trade contracts with plaintiff. The affidavit states that there are three other trade categories of wholesale distributors with whom the defendant is in some form of competition—specialty or "short line wholesalers", jobbers and diverters. The James affidavit continues:

"Neither the short line wholesalers, the jobbers nor the diverters purport to render the services required of full line wholesalers. They frequently do not deliver and they never carry a full stock of inventory. They sell only for cash or very short credit and deal with a limited number of retailers. They are able to exist because with a low overhead they can sell the products they carry for less than regular wholesale prices. In other words, they are able to compete with full line wholesalers only on a price basis."

There exists the possibility, therefore, that the complaints received by plaintiff had reference, in whole or in part, to wholesale distributors other than those affected by plaintiff's wholesale fair trade agreements.

The foregoing leads to the conclusion that there was a greater relationship between the plaintiff's action in establishing the policy against allowing its wholesale distributors to grant price discounts to retailers, and its action in allowing substantial discounts to direct retail accounts, than the plaintiff would have the court believe.

Plaintiff also points to the fact that for the first five months of 1954, its sales to wholesalers as a class increased 4%, as compared to sales to such wholesalers for the first five months in 1953, as proof there was no unfairness or inequity to wholesalers as a class. However, during this same period plaintiff's sales to retail accounts directly also increased for the same period over the preceding year, approximately 38%.

In General Electric Co. v. R. H. Macy & Co., 199 Misc. 87, 92, 103 N.Y.S.2d 440 the court states that a requirement for enforcement under the Fair Trade Law is that the relief sought be for the sole purpose of enforcement and not for any ulterior purposes. In the case at bar, although the plaintiff contends that in setting up its new policy at the wholesale level it acted in good faith, the practical effect of such policy, when taken together with the policy it adopted giving a 15% discount to direct retail accounts, is to allow plaintiff to undersell defendant while requiring it to maintain a stipulated wholesale resale price the plaintiff itself has fixed.

The facts here closely resemble those in the case of Gillette Safety Razor Co. v. Green, 167 Misc. 251, 3 N.Y.S.2d 822, affirmed without opinion, 258 App.Div. 723, 15 N.Y.S.2d 142. Gillette, a manufacturer of safety razors and blades, sought to enjoin defendants from selling Gillette products at wholesale prices below the fixed fair trade prices. In addition to sales to wholesalers, Gillette sold to retailers. The same set price was charged to wholesalers and retailers, less a discount of thirteen per cent and two per cent, but in the case of retailers, an additional eight per cent was allowed for so-called "Retail Sales Display and Promotion". Wholesalers were given only a three per cent allowance for so-called "Wholesale Sales Promotion." The court, held that the plaintiff's practice of granting larger discounts to retailers while restricting the price to its wholesalers constituted unfair competition, and granted judgment in favor of defendants. The court, 167 Misc. at page 252, 3 N.Y.S.2d at page 824, stated:

"The plaintiff has reserved to itself a group of retailers constituting possibly the most desirable group in the retail trade, to whom it gives the same discount * * * as it gives to its wholesalers, and in addition a percentage larger than that given to its wholesalers for sales display and promotion. This is, of course, a distinct trade advantage and effectually bars the wholesaler from this attractive and profitable market."

It concluded that permitting a practice such as plaintiff conducted would practically nullify the benefits the Fair Trade Act was designed to create.

The plaintiff, as well as the defendant, is eager, as the plaintiff asserts in its brief, for a "speedy determination on the basis of the record presented to this court on the pending motions for summary judgment" on the issue of "clean hands".

The essential facts are not in dispute. I find that the conduct of the plaintiff disentitles it to relief under the Fair Trade Act as sought in the complaint. The plaintiff's motion is denied and the defendant's motion is granted.

Settle orders.