REMINGTON ARMS, INCORPORATED, Plaintiff, *v.* FOX AND MURPHY, INCORPORATED, Defendant.

Supreme Court, Trial Term, Schenectady County, December 22, 1954.

*Frank Warner* for plaintiff.

*Leo W. Begley* for defendant.

HUGHES, J.   The facts have been stipulated to by both of the parties.   For the purposes of this opinion, the court adopts that stipulation here for a recitation of the facts; they are as follows:

" That the shot gun shells manufactured by plaintiff and advertised for sale and sold by defendant at prices less than Fair Trade prices *is alleged* by the defendant to be entirely from a stock of ammunition purchased by the defendant from S. Knitzer and Son of New York City and which came to the defendant as hereinafter set forth.   That as to the fact, as alleged by defendant, that the ammunition in question came solely from this source, plaintiff *can offer no proof to the contrary.*

" That the shot gun shells in question came from warehouse stock of Rose, Kimball and Baxter, which was located in a

warehouse on Old Court Road, Syracuse, New York. That a fire occurred in said warehouse on or about the 13th day of August, 1954 and said fire caused the sprinkler system to be turned on in this one-story warehouse and due to a faulty alarm system, the sprinklers continued to run for a period of approximately three hours before the fire was discovered and the sprinklers were turned off. That the fire itself was located approximately in the center of the warehouse at a point approximately 100 feet from the ammunition in question. That the ammunition in question was stacked on the floor in cardboard cartons, each carton containing 20 boxes of ammunition and it was so stacked in a single group approximately three cartons high. That some stock was on shelves in the same approximate location in 25 shell box lots.

" That all said ammunition, particularly shot gun shells of the plaintiff's make, was taken from the aforesaid warehouse in Syracuse by the Underwriters Salvage Company of New York, a corporation owned and operated by certain stock fire insurance companies, to their rented warehouse in Buffalo, New York. That, since all cartons and/or boxes of shot gun shells had been exposed to water from the aforesaid sprinkler system the various cartons and boxes were spread around the floor of the Buffalo warehouse for the drying of wetness or dampness if any. That a small percentage of the cartons were very badly soaked and were falling apart and the boxes in these cartons were taken out and dried separately. That most of the other outside cartons showed some evidence of water damage to the cartons but they were not opened.

" That the said Underwriters Salvage Company advertised a sale on sealed bids of the shot gun shells, among other things, to be held at Buffalo on September 17, 1954 and that the terms of the sale were to be ' as is, where is '. That said sale was held and Underwriters Salvage Company sold the entire lot of shot gun shells of plaintiff's make to S. Knitzer and Son, New York City upon said terms of ' as is, where is ' and S. Knitzer and Son in turn immediately sold a small portion of said lot to the defendant upon the same terms. That the shot gun shells were then shipped to the defendant in Schenectady.

" That said ammunition when brought to defendant's store was sold from the original cartons as received and although most of the cartons showed evidence of water damage to the cartons some of the 25 shell boxes contained in the cartons showed no apparent damage while other such boxes were obviously damaged, soiled and corroded.

"That defendant has sold or now offers for sale all of said ammunition at the rate of $2.30 for a box of 12 gauge shot gun shells and $2.15 for a box of 16 gauge shot gun shells, which prices are admittedly below the stipulated minimum fair trade price.

"That notice by defendant to the public of the condition of plaintiff's merchandise consisted solely of the statement ' small portion of stock slightly water damaged, but all merchandise is guaranteed by Fox and Murphy ', printed at the bottom of the newspaper ads which were attached to the plaintiff's motion papers and defendant's answering affidavit and that further, certain of these ads were posted on the store windows and door and that some of these ads were possibly lying loosely on the various counters in defendant's store."

The main question to be decided is whether the shotgun shells referred to in the stipulation are exempt from the operation of the Fair Trade Law (General Business Law, art. XXIV-A) by paragraph (b) of subdivision 2 of section 369-a of that law. That paragraph provides that the commodity is exempt from the Fair Trade Law under certain enumerated conditions, one of which is: " (b) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof."

There is no question raised here as to the constitutionality of the statute or whether the defendant is subject to the Fair Trade Law as a " Signer or Non-signer." These questions have been disposed of by the cases of *Bourjois Sales Corp.* v. *Dorfman* (273 N. Y. 167), *Old Dearborn Co.* v. *Seagram Corp.* (299 U. S. 183) and *General Elec. Co.* v. *Masters, Inc.* (307 N. Y. 229).

A novel question is presented. Counsel and court have made an exhaustive study of the cases and find that there is no authority precisely in point. A case cited by both parties is *Empire State Camera Exch.* v. *Reynolds* (194 Misc. 301).

It would be well to dwell upon that case for a moment. The plaintiff and defendant were retailers. From the facts of that case, the defendant was selling the same articles as the plaintiff, but below fair-traded price. The defendant's defense was that the articles he sold at a discount were " store demonstrators " and were so designated on the sales slip given to the buyer at the time of the sale, and, in some instances, had been, in fact rented out. The court however made a finding that the defendant offered discounts freely on *any* camera, and then, when he became suspicious that he was " being shopped " by some fair trade detective, he adopted the " store demonstrator " idea to cover himself. As to this method of subterfuge,

the court stated (*supra*, p. 303): " I entertain no doubt that even under such fair trade agreements a retailer bound thereby may and should advise his customer of any actual damage or deterioration in any particular article which is the subject of the sale, and that he may sell below the list price any particular article which is, in fact, damaged or deteriorated, provided he makes known to the customer the fact of the damage or deterioration and the fact that he is selling below list price because of such damage or deterioration, and provided that the discount below the list price is fairly proportioned to the nature and extent of the damage or deterioration."

The court in commenting on the device used by the defendant went on to say (*supra*, p. 303): " The notion that any and every camera becomes a ' store demonstrator ' and salable at less than list price merely because it has been taken out of its original package and placed in a show case or show window and handled by prospective customers who did not buy it, is wholly untenable and nothing more than a ruse to defeat the law."

It may be noted from that case (*supra*, p. 303) that the defendant " offered discounts freely on any camera." Also, that the defendant was selling new and undamaged articles by a subterfuge, " a ruse to defeat the law." There was no evidence or sufficient evidence in that case that the articles sold were actually damaged or that they ever fell out of the course of commercial trade in which fair-traded articles travel.

In drafting the Fair Trade Law, the Legislature saw fit to make three other exceptions to the application of the Fair Trade Law. Though two of those exceptions are not pertinent here, they all show that the Legislature was not content to apply a fixed statutory rule of law to every case without any exception.

The purpose of the Fair Trade Law is to prevent price-cutting that results in unfair competition. The pros and cons of this problem are inexhaustible. The Legislature being cognizant that price-cutting will not take any fixed form or path has left the complex problem open to court action and judicial interpretation. In *General Elec. Co.* v. *Macy & Co.* (199 Misc. 87, 91), the court made the following comment: " The Fair Trade Law is, in effect, a general statement of policy sanctioning vertical price fixing of commodities bearing the mark of the producer. It makes actionable in the courts, as unfair competition, any sales at prices below those fixed in accordance with the Fair Trade Law. This general statement of policy has been left on the doorstep of the courts without benefit of

administrative protection or rules and regulations for its development. While the advantages and disadvantages of this policy have been the subject of much controversy, the policy having been enacted into law in this State, it is the duty of the courts to interpret and enforce it so as to carry out the purposes of the Legislature.''

There is no question that if Fox and Murphy came by the articles by the ordinary course of trade, that is, that if they were never subjected to any damage, or deterioration, that the plaintiff would be entitled to injunctive relief. The defendant's affidavits show, without being controverted, that the regular stock is being sold at fair-traded prices. In this action, we are concerned with the stock which was purchased by the defendant as the result of a water and/or fire loss on an '' as is, where is '' basis.

There is no evidence of a subterfuge being used in this case. The facts in the stipulation reveal that the defendants have acted in good faith, without the employment of any ruse or device, and that the articles purchased from S. Knitzer were in fact subjected to water damage and purchased on an '' as is, where is '' basis. The stipulated facts state: '' That said ammunition when brought to defendant's store was sold from the original cartons as received and although most of the cartons showed evidence of water damage to the cartons some of the 25 shell boxes contained in the cartons showed no apparent damage while other such boxes were obviously damaged, soiled and corroded.''

It may be observed here that if such a shipment were received by Fox and Murphy in the ordinary course of business from one of Remington Arms, Incorporated, wholesalers, Fox and Murphy would be in a position to either reject it or else accept it subject to some adjustment and dispose of it by sale which would reflect the damage. There seems to be no reason why the same should not apply where the retailer purchases goods on an '' as is, where is '' basis and where there is actual damage or deterioration involved, and no device or subterfuge is being used. To order a retailer under the circumstances involved here to sell the articles at fair-traded prices would be asking this court in effect to require the defendant to sell and represent that the articles are new and undamaged in any way. Enjoining the defendant would not transform the damaged cartons and those in their very near proximity into new, untouched, undamaged and undeteriorated articles. Further, to require the defendant to sell the ammunition in question at fair-traded

prices would be asking this court to sanction a misrepresentation that the goods in question are new and have never been subjected to any damage or deterioration. This the court cannot do.

The interpretation of the Fair Trade Law does not require that every single shell, box or carton be damaged before it falls out of the ordinary course of fair-traded goods. A holding to the contrary would subject every buyer of damaged goods to a possible lawsuit because some of the goods survive apparently undamaged to a fire, accident or other occurrence.

The Fair Trade Law does not prescribe the type of notice required to be brought to the attention of the purchaser. The notice to the public of the condition of the merchandise consisted of the statement " small portion of stock slightly water damaged, but all merchandise is guaranteed by Fox and Murphy ", printed at the bottom of newspaper ads which were posted about the store. There is no question that this was public notice. A comparison of legal notices and other public notices to the type of print used in the ads shows that it is about the same.

To refuse an injunction in this case would not result in irreparable injury to Remington Arms, since the refusal would apply only to those articles that Fox and Murphy purchased which were subject to water damage and/or fire and purchased on an " as is, where is " basis. To grant an injunction would not only work a hardship but also require that Fox and Murphy sell goods at the fair-traded price, a course which would require the direct misrepresentation that the goods were new. In the interests of an equitable solution, therefore, an injunction is denied.

Submit order.