**GENERAL ELECTRIC COMPANY,**
a body corporate

v.

**HOME UTILITIES COMPANY, Inc.,**
a body corporate.

Civ. No. 7747.

United States District Court
D. Maryland.

May 6, 1955.

Semmes, Bowen & Semmes, David R. Owen, George D. Hubbard, Baltimore, Md., for plaintiff.

Harry Silbert and Melvin J. Sykes, Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, Chief Judge.

This is a suit by a manufacturer under the Maryland Fair Trade Act, Annotated Code of Maryland 1951, Art. 83, Secs. 102–110, for injunctive relief on account of alleged violation of the manufacturer's resale price restrictions on its products.

The plaintiff, a New York corporation, manufactures and sells electric housewares, clocks, fans and other electric appliances, and is qualified to fair trade under the Maryland Fair Trade Act. It seeks to enjoin the defendant, a Maryland corporation that sells electrical appliances at retail, within and without the State of Maryland, from cutting prices fixed by the fair trade agreements the plaintiff has with other retailers, of which the particular competing retailer, the defendant here, has had notice, although it has not itself made a fair trade agreement with the plaintiff. The jurisdictional requirements as to diversity of citizenship and amount involved are satisfied. It is admitted that plaintiff's trade-mark "G E" appears on all its appliances. Defendant in its answer asserts the defense to plaintiff's complaint for an injunction that plaintiff has acquiesced in open and notorious violation of its fair trade program in Maryland by numerous retailers and, therefore, is deemed to have abandoned such program.

Plaintiff, contemporaneously with the existence of its fair trade agreements with retailers, sells its goods to a number of wholesale distributors, including the General Electric Supply Company, with which it does not have a fair trade agreement. This company is one of three divisions of General Electric Distributing Corporation, a Delaware corporation, the stock of which is wholly owned by the plaintiff, with interlocking officers and directors. This wholesale distributor, in turn, has sold the plaintiff's products to the defendant at cut prices of which plaintiff admits it is aware and has not so far directly attempted to stop this wholesale distributor from doing so, but has requested it to co-operate in the fair trade program by advising their dealers of it; what the minimum retail prices are from time to time, and to advise the plaintiff of any violations by dealers.

On these facts, the question before the Court is this: is the plaintiff manufacturer entitled to injunction against the defendant requiring it to discontinue its cutting of prices fixed by the fair trade agreements in effect in Maryland?

■ The underlying purpose of fair trade legislation has been to protect commodities subject to trade which, apart from their physical value, embody a trade-mark, brand or copyright which is, in the law, a valuable property right. In 1911 the United States Supreme Court, Justice Holmes dissenting, held, contrary to numerous State decisions, that agreements by which manufacturers control retail prices of their products are invalid, and more specifically, that the manufacturer of an unpatented article could not, by rule or notice, in the absence of contract or statutory right, even though the restrictions be known to purchasers, fix prices for future sales; and that to the extent that interstate

commerce would thereby be affected, such price fixing violated the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. See also Federal Trade Commission v. Beechnut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, and cases therein referred to. However, in 1936, the Supreme Court sustained the validity of Illinois and California fair trade acts similar to the Maryland law as it now stands, holding that these Acts did not infringe the doctrine of the Supreme Court's previous decisions, including those dealing with legislative price fixing, the Court declaring that these decisions constituted no authority for holding that prices in respect of "identified" goods, may not be fixed under legislative leave by contract between the parties. Old Dearborn Distributors Co. v. Seagram Distillers Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109; Pep Boys v. Pyroil Sales Co., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122. In 1939, the Maryland Court of Appeals upheld the constitutionality of the Maryland Act. Goldsmith v. Mead Johnson & Co., 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339. At the present time, except in Missouri, Texas, Vermont and the District of Columbia, there are Fair Trade Acts in effect throughout the country.

The question having arisen as to whether these State laws could protect price maintenance agreements covering products in interstate commerce, in 1937 Congress passed the Miller-Tydings Fair Trade Act, 15 U.S.C.A. § 1, which specifically exempted these agreements from the Sherman Anti-Trust Act. In view of the practical difficulty often of securing signed agreements with all retailers handling a particular line of merchandise, these State laws imposed liability for price cutting not only upon the contracting retailers, but also upon non-contracting retailers who had notice of the existence of such a contract, and the minimum prices fixed thereunder. Until 1951, it was assumed that the exemption of the Miller-Tydings Act was sufficiently broad to permit enforcement of the producers' stipulated retail prices against retailers who had not actually signed price maintenance agreements with the producer in question. However, in that year the Supreme Court held otherwise. Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035. This decision naturally met with violent opposition by producers in their attempts to enforce fair trade laws. As a result, in 1952, Congress passed the McGuire Act, 15 U.S.C.A. § 45, which provided that re-sale price maintenance policies in accordance with the limitations of the Miller-Tydings Act should be effective and binding on persons "who are not parties thereto", section 1, 15 U.S.C.A. § 45 note, thus changing for the future the effect of the Schwegmann case. The following year this Act was upheld by the Fifth Circuit Court of Appeals and certiorari denied by the Supreme Court, in Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co., 205 F.2d 788, 346 U.S. 856, 905, 74 S.Ct. 71, 98 L.Ed. 369. In enacting the Miller-Tydings and McGuire Acts, as said by Judge Chesnut in Sunbeam Corp. v. MacMillan, D.C., 110 F.Supp. 836, at 843: "Congress had in mind the boundaries between Federal and State power. As to the Anti-trust Acts Congress had full constitutional power under the Interstate Commerce clause; but as to activities within the State the Federal power extended only to such activities as directly and appreciably affected interstate commerce. The plainly expressed purpose and policy of Congress in writing the two Acts was to remove the ban of anti-trust laws from interstate re-sale price maintenance policies conducted within the limitations of the Acts. But Congress had no power to validate such price maintenance if the law of a particular State was to the contrary. And as the fair trade laws of the States were not entirely uniform and as a few of the States did not have any fair trade law, it was necessary in

the Acts to recognize that State policy might be opposed to price maintenance."

The Maryland Court of Appeals has had the Maryland Fair Trade Act under consideration in several cases subsequent to Goldsmith v. Mead Johnson & Co., supra. See Schill v. Remington-Putnam Book Co., 1941, 179 Md. 83, 17 A.2d 175, 22 A.2d 128; Id., 182 Md. 153, 31 A.2d 467, 32 A.2d 296; Hutzler Bros. v. Remington-Putnam, 1944, 184 Md. 327, 40 A. 2d 823; Id., 186 Md. 210, 46 A.2d 101, 163 A.L.R. 884; Donner v. Calvert Distillers Corp., 1950, 196 Md. 475, 77 A.2d 305. The Maryland Act was also upheld by Judge Chesnut in 1953, in Sunbeam Corp. v. MacMillan, supra.

■ I reach the conclusion that the plaintiff is entitled to an injunction, and base this primarily upon the fact that the plaintiff, under all the circumstances as developed by the testimony, has exercised due diligence towards preventing the continued cutting of these fair trade agreement prices. Whether there has been due diligence depends upon each particular set of facts.

■ The rule set forth in the Hutzler Bros. case, supra, 186 Md. 210, 46 A. 2d 101 is controlling here, since Maryland law governs. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Summarized, the facts in that case were as follows: suit was brought by a Baltimore retail book seller, Remington-Putnam Book Company, which was a party to a fair trade agreement with a New York publisher, fixing minimum resale prices for that publisher's books, to enjoin Hutzler Brothers, a Baltimore department store, from violating this agreement by selling the New York publisher's books at a 25% discount. The Baltimore retail book seller had contested similar violations by other retail dealers of its fair trade agreements with other book publishers. In 1944 it had entered into an agreement with other publishers in New York, and Hutzler had been notified by these other publishers of their intention to enforce the fair trade agreement. However, Hutzler replied that following the decision of the Maryland Court of Appeals in the case of Remington-Putman Book Co. v. Schill, supra, certain Baltimore stores were ignoring the fair trade prices and were advertising and making sales at 15% below the list prices; that it was necessary to meet this price competition, and that since in the Schill case the fair trade agreement had been held to be unenforceable (because in restraint of trade and therefore in violation of the Sherman Anti-Trust Act), it would not be recognized. However, the Court found that the New York publisher, through the Remington-Putman Book Company, had made diligent efforts to secure compliance, although had not been fully successful, and, therefore, held that the publisher was entitled to an injunction. The Court said, 186 Md. at pages 215–216, 46 A.2d at page 103: "When any producer or retailer seeks the benefit of the Act, he should be given relief in equity only in case he has acted fairly toward all others affected by the contract. The Act requires by implication that the prices fixed in the contract shall be uniform in any competitive area. * * * Especially where the price cutting has been general and long continued, the failure of a producer to take effective measures to prevent such violation should be regarded as a waiver or abandonment of the rights conferred by the contract; otherwise, unjust discrimination, instead of a fair trade, would be the product of the statute. Hence, a court of equity will deny the producer injunctive relief against the violation of his resale price restrictions if it is shown that he waived his right to insist upon the maintenance of the resale price by permitting or tolerating the practice of price cutting by one or more of the retailers.

"However, the right of a producer or retail dealer to an injunction against a violator of a fair trade agreement is not defeated by the fact that there may be some violators of the agreement who have not been sued. In the first place, there is no mandatory provision in the Fair Trade Act requiring a producer

or retail dealer to take legal action to protect the price levels; the Act simply gives such person the right to take such action if he chooses. Secondly, it would often be impossible to enforce one's rights under a fair trade agreement if, as a prerequisite to relief, it were necessary to institute suit to enjoin all violators simultaneously, or show that the complainant has forced all other dealers to comply with the agreement. We hold that a retailer of a copyrighted book cannot take advantage of an alleged breach of a fair trade agreement by others as a defense to a suit against him, unless the violations indicate improper discrimination or unfair business practices, or an acquiescence in the unlawful cutting of prices, or a waiver or abandonment of rights acquired under the statute. In bringing a suit for injunction against a violator of such an agreement, it is sufficient if the complainant has exercised reasonable diligence to prevent price cutting by other violators."

Viewing all the circumstances of the present case as disclosed by the weight of the credible testimony, and the admitted facts as set forth in a rather lengthy stipulation of the parties, it is found that the rule of reasonable diligence, as laid down in the Hutzler case, has been complied with by the present plaintiff. The weight of the credible evidence shows the following: that there have been 69 violators in Maryland of plaintiff's fair trade agreements; 18 suits have been filed; 233 different retail dealers have been investigated, and there have been several hundred so-called individual shoppings, that is, different investigations conducted by the plaintiff; that there are in Maryland more than 1,000 retailers of the plaintiff's products; and that a recent investigation by the plaintiff showed a reduction of approximately 50% in the number of violations of fair trade agreements, as a result of plaintiff's activities with respect to such violations by bringing suit, or by resorting to less drastic means, such as warning of suits. The plaintiff has never fair traded at the wholesale level. It was found to be administratively too difficult and that it was not as effective against price cutting as fair trading at the retail level proved to be. In other words, it was found that fixing prices on the wholesale level was not sufficiently effective in preventing the retailer from still cutting prices. Also, plaintiff refrained from fair trading on the wholesale level because of the fact that the Supply Company was its wholly owned subsidiary and, being a selling company, it was felt that fair trading with it might be opposed by the Government, because both the Department of Justice and the Federal Trade Commission have disapproved of the same company fair trading at wholesale when both manufacturing and selling at wholesale. Plaintiff's present method is the same as that of many other companies, including its competitors.

In the face of such testimony, the plaintiff is not to be considered as having abandoned or waived its system of fixing prices under fair trade agreements. The fact that plaintiff might have done something else that might have been more effective as respects the present defendant and other violators, is not the answer to the problem. The real question is whether the requirements of reasonable diligence, as laid down by the Maryland Court of Appeals in the Hutzler case, has been met, in the light of all the facts and circumstances developed in the present case. I find that it has been. The discounts in wholesale prices given defendant by the Supply Company are not in themselves sufficient to bar plaintiff being afforded the requested injunctive relief. However, if such discounts persist with plaintiff's knowledge, and plaintiff does not then take affirmative action to stop them, it may be that plaintiff should then be required to cancel the distributor franchise it has given to the Supply Company. There is no requirement in law that the plaintiff shall enter into agreements with the Supply Company or any of its distributors to cut off fair trade violators.

Such a course might involve the plaintiff in a violation of the anti-trust laws. See Fashion Originators' Guild of America, Inc., v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. The basis for legality of the fair trade policy with which we are here concerned is that producers shall be in active competition with products of the same general class and that agreements in support of this fair trade policy are made only on the so-called "vertical level" and not on the "horizontal level", that is to say, such agreements are permissible between manufacturers, wholesalers and retailers, but not between manufacturers and manufacturers, or wholesalers and wholesalers, or retailers and retailers. In other words, this policy of the fair trade laws allowing vertical price fixing has to do with a small area situated in otherwise prohibited territory.

Under circumstances quite similar to those here presented, injunctive relief has been granted this same plaintiff in several instances in New York. See especially General Electric Co. v. R. H. Macy & Co., 199 Misc. 87, 103 N.Y.S.2d 440; General Electric Co. v. S. Klein-on-the-Square, Sup., 121 N.Y.S.2d 37, and General Electric Co. v. Veeds Television & Appliances Co., Sup., 129 N.Y.S.2d 278.

In the Klein case, just referred to, the Court, in granting injunctive relief, said, 121 N.Y.S.2d 37, at page 54: "The statute says nothing about any duty on the part of the producer of a trade-marked commodity to enforce its retail sales price agreements, although the legislature must have contemplated that there probably always will be some retailers who will not abide by price fixing agreements. But it would be so manifestly unjust and inequitable to allow the producer to enforce its retail sales price agreements against some retailers while deliberately acquiescing in violations by other retailers that the courts have evolved the rule that, while the mere fact that there are other violators is not of itself a defense which will defeat an injunction against one violator, it is necessary that the producer make a sincere and diligent effort to prevent price-cutting, and where price-cutting is so general and long continued as to indicate that the producer has waived or abandoned his rights under the statute and the price fixing contracts an injunction against one price cutter will be denied."

In the Veeds case, just referred to, the Court also granted injunctive relief, and said, 129 N.Y.S.2d 278, at page 279: "The fact that plaintiff's wholly owned subsidiary sells to defendant at less than the listed wholesale price does not relieve defendant of its obligation to sell at the fixed retail price. The agreement which it is sought to enforce affects only sales at retail. The effect of a 'more than one wholesale price policy' on plaintiff's right to enforce the agreements or to obtain equitable relief does not arise in a situation such as this where it appears that defendant has been able to obtain plaintiff's 'fair traded' products at prices no higher than other retailers', General Electric Co. v. S. Klein-on-the-Square, supra, 121 N.Y.S.2d 37, 57, 58."

A decree granting a permanent injunction will be signed.