**EASTMAN KODAK COMPANY,**
a body corporate,

v.

**HOME UTILITIES COMPANY, Incorporated,** a body corporate.

Civ. No. 8379.

United States District Court
D. Maryland.

Feb. 14, 1956.

David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Harry Silbert and Melvin J. Sykes, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

Plaintiff, Eastman Kodak Company (Eastman), a New Jersey corporation, sued Home Utilities Company, Incorporated (Home Utilities), a Maryland corporation, for violation of the Maryland Fair Trade Act, Annotated Code of Maryland, 1951 Edition, Article 83, §§ 102–110. In addition to the jurisdictional allegations as to diversity of citizenship (which was admitted), and amount in controversy in excess of $3,-000 (which was proved), the complaint alleged that plaintiff was engaged in the business of manufacturing cameras, films and other photographic supply items, and selling them throughout the State of Maryland; that such commodities bear plaintiff's trade-marks, brands and names, and are in free and open competition in this State with commodities of the same general class produced by others; that plaintiff had spent large sums in promoting and advertising said commodities, and had established a valuable reputation and goodwill therefor; that plaintiff had entered into Fair Trade Agreements with retail dealers in Maryland, under which plaintiff had stipulated minimum retail resale prices; that defendant with knowledge of such agreements and of the established minimum retail resale prices, advertised, offered for sale and sold such articles at below the established minimum retail resale prices and was threatening to continue to do so, to the irreparable damage of plaintiff, and the impairment and destruction of plaintiff's good-will and the value of its trademarks, brands and

name. A permanent injunction was sought.

Defendant's answer admitted substantially the factual allegations of the complaint, except it denied the validity of the fair trade agreements, and denied damage to Eastman; admitted sales below the established minimum retail resale prices, but claimed justification in law for the sales made by it; averred that it had never signed any fair trade agreement with plaintiff, and was contesting the validity of the non-signers' clause in the state courts on "new and substantial questions under the Constitution and laws of the State of Maryland"; and pleaded specially that plaintiff was barred from relief by unclean hands in that plaintiff had failed to make diligent efforts to enforce the fair trade agreements.

At the trial, additional defenses were raised that plaintiff's goods were not in free and open competition with commodities of the same general class produced by others; and that plaintiff was illegally attempting to fair trade a "package" containing some articles not independently fair-traded. Defendant admitted that it was a "discount house", its policy being to sell all[1] articles, including those produced by plaintiff, at less than fair trade prices.

The background and legislative and judicial history of the fair trade laws have been so thoroughly and recently covered by decisions in this district that a reference thereto without repetition or further elaboration should suffice. See General Electric Co. v. Home Utilities Co., D.C.D.Md.1955, 131 F.Supp. 838, affirmed per curiam, 4 Cir., 1955, 227 F.2d 384; Revere Camera Co. v. Masters Mail Order Co., D.C.D.Md.1955, 128 F.Supp. 457; Revere Camera Company v. Masters Mail Order Co., D.C.D.Md.1954, 127 F.Supp. 129; Sunbeam Corp. v. MacMillan, D.C.D.Md.1953, 110 F.Supp. 836. We come then to a consideration of the three defenses.

1. *Unclean hands—failure to exercise reasonable diligence to prevent price cutting.*

The jurisdiction of this court being dependent upon diversity of citizenship, the law of Maryland is controlling. Erie Railroad Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Ruhlin v. New York Life Ins. Co., 1938, 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290. The Maryland law with respect to the obligation of a fair trader to use reasonable diligence to prevent and correct price cutting is clearly stated in Hutzler Bros. Co. v. Remington Putnam Book Co., 1944, 186 Md. 210, at pages 215–216, 46 A.2d 101, at page 103, 163 A.L.R. 884, where the court said:

"When any producer or retailer seeks the benefit of the Act, he should be given relief in equity only in case he has acted fairly toward all others affected by the contract. The act required by implication that the prices fixed in the contract shall be uniform in any competitive area. * * * Especially where the price cutting has been general and long continued, the failure of a producer to take effective measures to prevent such violation should be regarded as a waiver or abandonment of the rights conferred by the contract; otherwise, unjust discrimination, instead of fair trade, would be the product of the statute. Hence, a court of equity will deny the producer injunctive relief against the violation of his resale price restrictions if it is shown that he waived his right to insist upon the maintenance of the resale price by permitting or tolerating the practice of price cutting by one or more of the retailers.

"However, the right of a producer or retail dealer to an injunction against a violator of a fair trade agreement is not defeated by the fact that there may be some violators of the agreement who have not

---

1. Except in those instances where injunctive orders had been issued.

been sued. In the first place, there is no mandatory provision in the Fair Trade Act requiring a producer or retail dealer to take legal action to protect the price levels; the Act simply gives such person the right to take such action if he chooses. Secondly, it would often be impossible to enforce one's rights under a fair trade agreement if, as a prerequisite to relief, it were necessary to institute suit to enjoin all violators simultaneously, or show that the complainant has forced all other dealers to comply with the agreement. We hold that a retailer of a copyrighted book cannot take advantage of an alleged breach of a fair trade agreement by others as a defense to a suit against him, unless the violations indicate improper discrimination or unfair business practices, or an acquiescence in the unlawful cutting of prices, or a waiver or abandonment of rights acquired under the statute. In bringing a suit for injunction against a violator of such an agreement, it is sufficient if the complainant has exercised reasonable diligence to prevent price cutting by other violators."

See also General Electric Co. v. Home Utilities Co., D.C.D.Md.1955, 131 F. Supp. 838, 841–842, affirmed, 4 Cir., 1955, 227 F.2d 384; Revere Camera Co. v. Masters Mail Order Co., D.C.D.Md. 1955, 128 F.Supp. 457, 460.

Testimony on behalf of Eastman was to the effect that the office manager in its Sales Department in Rochester, N. Y., was Eastman's enforcement director. Customarily all complaints were sent to and initially processed by him. Eastman's salesmen were instructed to report any violations brought to their attention, but it was not part of their duties to police the trade or to seek out violators. Eastman has no fair trade agreement with wholesalers. It relies primarily upon the watchfulness of retailers observing the fair-traded prices of other retailers to report violations by such retailers. No check was made by Eastman of fair trade compliance in Maryland until after a complaint had been received against Home Utilities from another retailer in December 1954. Prior thereto, four complaints of violations in the Maryland area had been received. On checking, one of these was found to relate to a wholesale house, not a retailer; no tangible evidence was obtained against the other three.

Ordinarily, when a complaint satisfactorily documented by affidavit of purchase, or sales slip, is received, a letter is sent to the alleged violator, stating that there has been a complaint of the violation of Eastman's fair trade agreements, and enclosing a price list. This is followed by a purchase of articles from the alleged violator, and if a violation is so found, a registered letter is sent demanding compliance. The retailer is again shopped, and if three violations [2] are found, the file is sent to the legal department for the institution of proceedings.

Home Utilities was sent the standard first complaint letter on April 1, 1955, and the usual registered letter on May 3, 1955.

In April 1955, and in August-September 1955, a total of 191 shoppings were made of 106 retailers in the Baltimore area. Efforts were made to cover a cross-section of retailers handling photographic equipment, and to purchase items ordinarily stocked. The April 1955 shopping disclosed 8 violators. Subsequent shoppings showed that three of these retailers had no further violations; three had a second violation, but none in the last two or three shoppings; one had a second violation after compliance in two intermediate shoppings; and only Home Utilities had a record of constant violation. The August-September shoppings also developed six in-

---

2. Eastman seeks to develop evidence of a series of violations, to combat the possible defense of inadvertence, or fault of the sales help, rather than of supervision or management.

stances of violations not disclosed by the April shopping, and written warnings were sent, followed by compliance as checked in repeat shoppings.

This record certainly does not evidence a waiver by permitting or tolerating the practice of price cutting. Hutzler Bros. Co. v. Remington Putnam Book Co., 1944, 186 Md. 210, 46 A.2d 101, 163 A.L.R. 884. On the contrary, it shows reasonable diligence and satisfactory results.

■ An effort was also made by Home Utilities to establish a waiver of enforcement by Eastman on the claim that it had countenanced the sale by a competitor of Home Utilities of a package, or kit, containing some Eastman branded and fair-traded products; some Eastman branded but not fair-traded products, and some non-Eastman, non-fair-traded articles, all sold together at a unit price; and that if the normal retail selling price of the non-fair-traded articles was subtracted from the unit price, the remainder would be less than the aggregate of the established fair-trade prices for the fair-traded articles in the package. Whatever would be the significance and effect of condonation by Eastman of such a practice if it had been proved (see Magazine Repeating Razor Co. v. Weissbard, 1939, 125 N.J. Eq. 593, 7 A.2d 411; Bathasweet Corp. v. Weissbard, 128 N.J.Eq. 135, 15 A.2d 337), the evidence failed satisfactorily to establish the normal retail selling price of some of the non-fair-traded compo-

nents, and therefore there was no adequate proof that in fact the fair-traded articles were not included at their established fair-trade prices.[3]

■ The court therefore concludes that Home Utilities has failed to establish by the weight of the credible evidence that Eastman had not exercised reasonable diligence to prevent price cutting in the Baltimore area.

2. *Free and open competition with commodities of the same general class.*

Resale price maintenance agreements are authorized under the Maryland statute with respect to "a commodity which bears, or the label or container of which bears * * * the trade-mark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities of the same general class produced or distributed by others * * *." Code of Public General Laws, 1951 Ed. art. 83, § 103.

Conclusory testimony was offered both that commodities bearing the Eastman trade-mark and fair-traded by it[4] were, and were not, competitive with commodities of the same general class produced by others.

The testimony on behalf of both Eastman and Home Utilities was to the effect that there was no substantial price competition between Eastman fair-traded products and similar products of other manufacturers, most of which were also fair-traded. If a price change was made

3. The broader aspect of the "package" containing both fair-traded and non-fair-traded articles is considered in point 3, infra.

4. Kodachrome (color film manufactured by Eastman) and Magazine Film, were formerly fair-traded by Eastman. Findings by the Federal Trade Commission that these items were not in free and open competition with items of the same general class were affirmed, Eastman Kodak Co. v. Federal Trade Comm., 2 Cir., 1946, 158 F.2d 592, certiorari denied 1947, 330 U.S. 828, 67 S.Ct. 869, 91 L. Ed. 1277. They were promptly removed from the fair-trade lists. According to the testimony, after color film was taken

off the fair-trade lists, Eastman continued to sell it at the same price, with no drop in volume.

Flash holders manufactured by Eastman have never been fair-traded as such. Eastman admitted that for an indefinite time, usually at least 3–4 months, after a new model flash camera was put on the market, there would be no competitive flash holder available to the public.

Also, for reasons not explained in the testimony in this case, Eastman has within the past three years taken its 8 x 28 camera and accessories off the fair-trade lists.

by one manufacturer, it was usually countered by a similar price reduction or a change in the "competitive" product. The popular 620 film sold at 50¢ a roll; when Ansco reduced the price to 45¢, Eastman immediately followed; and this instance was "representative" of operations. Eastman fair-trade prices were ordinarily within a few cents of the fair-trade prices of similar articles manufactured by others.

As the impact of the Fair Trade Laws is solely in the field of resale price maintenance, and as substantially all photographic articles manufactured by Eastman have counterparts produced by others and fair-traded by them at almost identical prices, this court was and is concerned as to whether such goods can, within the meaning of Article 83, § 103 of the Maryland Code of Public General Laws, 1951 edition, be considered as "in free and open competition", with commodities of the same general class produced by others. So far as the court is advised, or as its own research has developed, in no reported case has this almost complete lack of competition with non-fair-traded articles existed, or been mentioned.[5]

In one case, where it did not appear that the field was pre-empted by fair-traders, the court held that the fact that prices fixed by competing distributors were "within 1¢ of parity" did not constitute a defence to the enforcement by plaintiff of its fair-trade prices. The court considered that this closeness of price might be due to an unlawful agreement; but it might be the result of close competition (as in the case of gasoline, etc.); or a case of " 'follow the leader' "; and in any event "it is not a violation of any law to copy the prices of a competitor." Eli Lilly & Co. v. Saunders, 1939, 216 N.C. 163, 4 S.E.2d 528, 540, 125 A.L.R. 1308.

Eastman further contends that price competition is not the only form of competition possible (with which the court takes no issue); and that "competition" as used in the Fair Trade Laws is likewise not so restricted. In support of this position, it cites the following cases (none of which shows the same absorption of the field by fair-traders), and the legislative history of the Miller-Tydings, 15 U.S.C.A. § 1, and McGuire, 15 U.S.C.A. § 45, Acts. The cases cited are: Sunbeam Corp. v. MacMillan, D.C. D.Md.1953, 110 F.Supp. 836, 838, holding that Sunbeam "is in active competition with other manufacturers of similar products"; General Electric Co. v. Home Utilities Co., D.C.D.Md.1955, 131 F.Supp. 838; affirmed per curiam, 4 Cir., 1955, 227 F.2d 384, in which the district judge stated that "active competition" is the basis for the legality of fair trade; Eastman Kodak Co. v. Lee-Wilson, Inc., D.C.D.Mass.1955, 138 F.Supp. 591, (affirmed Lee-Wilson, Inc., v. General Electric Co., 1 Cir., 1955, 222 F.2d 850), in which the District court said that "it was conceded at the bar that there are for sale in this District other types of cameras and other types of films made by other companies";[6] and Eastman Kodak

---

5. The cases, few in number, specifically passing upon "free and open competition", are briefly analyzed in Commerce Clearing House Trade Regulation Reporter, par. 3154. As pointed out in Fulda, Resale Price Maintenance, 21 U. Chicago L.Rev., 175, 197–198 (1954):

"* * * the provision involved in these cases does not answer the question as to what will happen if all other commodities of the same general class are also fair-traded. A wide variety of fair-trade prices seems to prevail in many lines; in others, uniformity, or near uniformity, of price appears to be the rule * * *."

For very recent and somewhat acrimonious discussions of some of the problems of the Fair Trade Laws see: Adams, Resale Price Maintenance, Fact and Fancy, 64 Yale L.J. 967 (1955); Herman, A Note on Fair Trade, 65 Yale L.J. 23 (1955); Adams, Fair Trade and the Art of Prestidigitation, 65 Yale L.J. 196 (1955); and see the footnote references therein to the enormous quantity of literature on the subject.

6. The claim that there was not "fair and open competition" apparently was based upon an alleged monopoly, as the court said that the fact that plaintiff had a "lion's share of the business does not indicate that one is not in fair and open competition."

Co. v. Schwartz, d/b/a Aljan Camera Co., Sup.1954, 133 N.Y.S.2d 908 (finding that certain of Eastman's products were in free and open competition while others were not).

It is also argued, with some substance, that the holding in Schill v. Remington Putnam Book Co., 1941, 179 Md. 83, 17 A.2d 175, 22 A.2d 128, indicates a conception of competition embracing many facets (not discussed) of which price is only one. The Maryland Court of Appeals, after carefully pointing out that to come within the provisions of the Fair Trade Law a copyrighted book "must be found to be in competition" then asks the pertinent question: "but in competition with what?" 179 Md. at page 88, 17 A.2d at page 178. The question is "answered" as follows, 179 Md. at pages 91–92, 17 A.2d at page 179:

"If the reading public bought books generally without regard to titles or subject matter, undoubtedly price variations tending to encourage the purchase of the cheaper volumes would justify a description of the situation as one of competition. But the classical student originally bent on securing a copy of Plato's 'Republic' would not shift his choice to a detective story, merely because the latter could be obtained for less money. Nor would the civil engineer, seeking a text-book on water supply, purchase a theological treatise [7] as an alternative to expending a larger sum for a technical work desired. It follows therefore, that *if it is to be said that competition*, as defined in the act, *exists* in the bookselling business, it must be found in connection with books of almost, if not entirely, identical contents." (Emphasis supplied.)

In considering the argument that as to copyrighted books "the only competition is the price competition" so that if prices were fixed, all competition would end, and an unreasonable monopoly in violation of the Act would be permitted, the answer (179 Md. at page 93, 17 A.2d at page 180), was a reference to the copyright laws, held not to be involved, and the otherwise unexplained conclusion that the Maryland Fair Trade Law was not to be restricted, with respect to maintaining fair trade prices, to uncopyrighted books.

Eastman also seeks to derive comfort from the holding, in Columbia Records v. Goody, 1951, 278 App.Div. 401, 105 N.Y.S.2d 659, that the fact that plaintiff had exclusive recording contracts with certain artists did not prevent fair-trading such records, when competing manufacturers made records of each composition in public demand. Here the same composition could be obtained from various sources, and perhaps at different prices.[8]

Glen Raven Knitting Mills v. Sanson Hosiery Mills, 4 Cir., 1951, 189 F.2d 845, 854, understandably held that where Sanson and one licensee alone fair-traded patented and branded stockings, "it defies common sense to say that addition of a design to a stocking takes it out of the same general class of stockings of its competitors."

This court questions whether the decision in Eastman Kodak Co. v. Federal Trade Commission, 2 Cir., 1946, 158 F. 2d 592, certiorari denied 1947, 330 U.S.

7. He might have wanted to read the story of the Flood, Genesis, chs. 7 and 8.

This court is of course bound by the specific holding of the Maryland Court of Appeals. Cf. Fulda, Resale Price Maintenance, 21 U.Chicago L.Rev. 175, 197–198 (1954): "Of particular interest, perhaps, are the decisions that copyrighted books must be treated like other commodities for purposes of fair trade in spite of the fact that a reader who wishes to buy The Grapes of Wrath will not

likely be content with Ferdinand the Bull"; with which this court concurs, and also doubts if the would-be purchaser of Schnitzler's Casanova's Homecoming would settle for Hardy's The Return of the Native.

8. Those who wished to hear the William Tell Overture could do so; whether under the baton of a leader of a symphony orchestra, or as "rendered" by Spike Jones.

828, 67 S.Ct. 869, 91 L.Ed. 1277, that "effective" competition required that a purchaser "must be able to buy it from more than one manufacturer" was intended to or does justify the conclusion that without more, there is "effective" competition if there are two manufacturers; especially if both fair-trade at the same price.

In fact, the concept that competition through the medium of non-fair-trading producers is essential seems supported by the citations of legislative history relied upon by Eastman. House Report 1437 on the McGuire Bill reports hearings by the Committee on Interstate and Foreign Commerce, through its subcommittee on Fair Trade Legislation, in which (page 3) the following appears:

> "Proponents of fair-trade argue that the consumer actually determines the price at which competing fair-traded articles are sold because the consumer has complete freedom of choice not only among fair-traded articles *but also may turn* from fair-traded articles *to private brands* promoted by department stores, chains, and mail order houses." (Emphasis supplied.)

Specifically supporting the proposition that "free and open competition" may exist, even although prices are identical (but not specifically applied to cases where the entire field is fair-traded) is the Report of the Attorney General's National Committee to Study the Antitrust Law (1955), p. 332:

> "Effective competition is therefore compatible with meeting (or matching) the prices of rivals, or with undercutting them. Furthermore, prices uniform as among the respective sellers may under the pressure of falling demand give way to a period of undercutting, after which price again settles down to uniformity at a lower level. Hence these are not two mutually exclusive patterns, and price uniformity as of any given short period is not significant, even when the costs of various sellers are widely different from one another."

■ The court therefore reluctantly and with no enthusiasm finds that despite the uniformity of prices and the substantially complete coverage of the field of Eastman fair-traded products by similar fair-traded products, the Eastman fair-traded products are, within the meaning of the term as employed in the Maryland Fair Trade Act, in free and open competition with products of the same general class.

3. *"Packages" containing non-fair-traded articles.*

In the fall of 1949 Ansco put out an "outfit" designed for the Christmas trade. This contained all the articles necessary for the taking of flashlight pictures—a camera, film, flash holder, flash bulbs and batteries. It served the convenient purpose of salesmanship of all articles needed for the taking of flash pictures, and helped to negate the ignorance or thoughtlessness of parents or other donors who created the holiday incentive for the taking of pictures, without providing the capacity for complete fulfillment. The reception was encouraging, and the next year Eastman offered a similar outfit. It was expected to be a seasonal novelty, but to the surprise of Eastman, it has become a year-round sales item, although the Christmas trade represents the bulk of the sales.

Eastman puts out 14 outfits. All contain a fair-traded camera manufactured by Eastman, and a non-fair-traded flash holder manufactured by Eastman. Seven of the 14 outfits contain batteries, flash bulbs and film. The film is manufactured and fair-traded by Eastman. The batteries and films are perishable commodities—"expendables"—and are included only in the low priced fields, purchased by the uninitiated. The more expensive sets, bought by the "better informed", are of relatively slow turnover, and films and batteries might seriously deteriorate on retailers' shelves.

All outfits are packaged attractively in a substantial cardboard box, which also serves as a carrier, bearing the Eastman trademark. Each case contains a book of instructions. Whether such book is more informative than the booklets furnished free of additional charge with the components is doubtful. The testimony indicated that the utility of the container was dependent upon the habits of the purchaser; some would retain the case for a matter of months; others would discard it immediately upon purchase.

The evidence clearly established the fact that the package was a good item of salesmanship. Personal examination by the court leads to the finding that the package is attractive.

In addition to the camera and black and white film, which are made by Eastman and fair-traded, and the flash holder, made by Eastman and not fair-traded, the typical cheaper package contains flash bulbs made by any of three manufacturers; General Electric or Westinghouse, whose bulbs, although identified by symbol or name, are not fair-traded; or Sylvania, whose bulbs are identified by a "dot" and are fair-traded in cartons. They also contain batteries made by Bright Star, Olin or Penlite-Burgess, all of which are identified by the maker's name, but none of which is fair-traded by the manufacturer.

Eastman has included each of these outfits, packages or kits, in its fair-trade lists immediately upon placing them upon the market.

It should also be noted in this connection that in addition to flash holders, which are not fair-traded, Eastman does not fair-trade "accessories". These include filters, tripods, and lenses, except for amateur motion picture cameras. The explanation offered was that there were so many of these that it would be difficult to know where to stop—so none is fair-traded.

One of the elementary outfits was offered as an exhibit. The various types of batteries, and flash bulbs, were separately introduced as exhibits. That which would probably be implicit was physically apparent by the simple expedient of removing the components from their containers—whether the carrying case, or the separate containers for the bulbs and batteries. They retained their individual identity and utility; and any of the equivalent parts could be replaced at will, either in the package, or in the use of the camera. Further, at the risk of reciting the obvious, the camera and film were completely usable for the taking of daylight pictures without the use of any other of the components of the package.

The claim of Eastman was not that the components were not completely and satisfactorily usable as separate items, or that they had a different utility as an aggregate than they had as separate components, but only that they were all "related in use". This would seem to limit the scope of a package only by the ingenuity of the composer, or the ultimate sales acceptance of the public. By a parity of reasoning, tripods, exposure meters, stop watches, carrying cases, shoulder straps, sun visors, umbrellas, electric cords, switches, humidors, developing tanks, etc.; regardless of by whom made and whether or not fair-traded by the maker, could be incorporated into a package, and the package fair-traded. In fact, if the package concept were sound, items not themselves susceptible of individual fair-trading, as flash holders (which are found in the typical package), and color and magazine film (which have not, so far, been included) could be metamorphosed or dematerialized or integrated so as to achieve a resale price maintenance "legality by association", that they could never achieve by their own merits.

A number of questions are presented:

(a) Does the Eastman "Retailer Fair Trade Agreement" cover a package containing articles not manufactured by Eastman?

The standard Eastman "Retailer Fair Trade Agreement" contains the following recital:

"Whereas Kodak is the *manufacturer* of certain products now or

hereafter made subject of this Agreement (hereinafter called 'said Kodak products'), listed in the Schedule of Products and Minimum Prices attached hereto and made a part hereof, which products are and will be distributed under the trademarks, brands, or trade names owned by Kodak in fair, free, and open competition with commodities or products of the same general class produced or distributed by others, and Dealer is engaged in selling said products at retail and the parties hereto, *as manufacturer* and retailer respectively, desire to avail themselves of the benefits of the Fair Trade Act of the state in which Dealer's principal place of business is located and of the Fair Trade Acts of other states, where applicable, and the Acts of Congress relating thereto now and hereafter in effect to the full extent permitted by said Acts." (Emphasis supplied.)

It is the conclusion of the court, for reasons to be set forth in detail later in this opinion, that the "packages" involved are a mere aggregation of components and not a new commodity. Even were this erroneous, it would in the opinion of the court stretch the definition of the word "manufacturer" beyond the breaking point to describe as a manufacturing process the placing of camera, film, flash holder, batteries, bulbs and booklet (or any accessories) in a cardboard container with cardboard fittings recessed to hold them in place, instead of placing them loosely in a bag or box, or firmly positioned by paper, scotch tape or excelsior. The package or "outfits" are found in the price lists under the various headings of "Cameras".

That Eastman recognized that articles can be sold in "combination" without a new product being "manufactured" is seen by paragraph 3 of the Retailer Fair Trade Agreement which forbids "the offering for sale or selling of any of said Kodak products in combination with any other merchandise, which offer or sale has the practical result of reducing the selling price of said products below the minimum retail selling price stipulated herein, in violation of the provisions or intent of the applicable Fair Trade Act * * *."

Strictly construed against Eastman, the author of such Agreement, the court could hold that the Agreement did not apply to package or outfit aggregations even where only products of Eastman's "manufacture" were included. Such holding, however, would not be dispositive of the fundamental issues. Ingenuity would not have to be too subtle to devise definitions in the Agreement that would meet the indicated objections. Moreover, it might well be questioned if such failure to cover the package items in the Agreement would mean anything more than that as a *unit* the attempt to fair-trade was ineffective. That is a far cry from saying that therefore the items independently fair-traded also lost their protected status.

In any event, the parties have sought a ruling on the broader aspects of packaging apart from the provisions of the Standard Retailer Fair Sales Agreement; and a special hearing restricted to evidence and argument on this phase was had.

(b) (1) Can a manufacturer fair-trade only a part of its products in the same field, and (2) may they be included in a fair-traded package with other non-fair-traded items of its own manufacture?

(1) As the alleged justification for Fair Trade Laws is the protection of the good will of the manufacturer,[8] this

---

8. Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 1936, 299 U.S. 183, 57 S.Ct. 139, 144, 81 L.Ed. 109; General Electric Co. v. Home Utilities Co., D.C.D.Md.1955, 131 F.Supp. 838, affirmed per curiam, 4 Cir., 1955, 227 F. 2d 384; Revere Camera Co. v. Masters Mail Order Co., D.C.D.Md.1955, 128 F. Supp. 457, 460.

court would have assumed that such good will (largely the result of advertising, and the creation of the association of the manufacturer's name with quality merchandise) would be "protected" by the fair trading of all articles within a particular line—especially if all such articles were trademarked or "branded." The enormous advertising of which Eastman is so justly proud is intended to create such good will for its entire line of photographic equipment.[9] The failure to fair-trade flash holders (after they become competitive), filters, tripods, lenses (except for amateur motion picture cameras) and "accessories" generally, and the removal of the 8 x 28 camera from fair-trading, suggest to the court that either (i) fair-trading is not necessary for the protection of Eastman's good will, or (ii) Eastman's concept of good will is a fluctuating one, and entirely a matter of expediency. Its partial exercise might well "seem to indicate a purpose other than the protection of the good will associated with" its product.[10]

However, two New York courts have expressly held that a producer can effectively fair-trade some of its trademarked or branded articles, despite its failure to fair-trade others in the same general field. Columbia Records, Inc., v. Goody, 1951, 278 App.Div. 401, 105 N.Y.S.2d 659, 665, and General Electric Co. v. S. Klein-on-the-Square, (Sup.1953), 121 N.Y.S.2d 37, directly [11] so hold.

(2) A limitation on the right of a manufacturer to pick and choose which of its trademarked or branded products in the same field it will fair-trade was announced in a case involving this plaintiff. In Eastman Kodak Co. v. Siegel, d/b/a Tower Photo Shop, 1955, 207 Misc. 283, 136 N.Y.S.2d 800, Eastman sought a preliminary injunction to prevent sale below the fair-traded price of a package (similar to the cheaper outfits involved in this case) containing two articles manufactured and fair-traded by it; two articles manufactured by it and trademarked but not fair-traded; and two articles not manufactured by it, and not fair-traded by the manufacturers. Defendant's resale price was in excess of the totals of the fair-traded items. In refusing a preliminary injunction, Levy, J., said, 136 N.Y.S.2d at pages 804–805:

"Under the common law, there was complete freedom of resale, and retail price-fixing by the wholesaler was unenforceable (see, as to constitutionality of the statute, Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30, 110 A.L.R. 1411). The Fair Trade Act, being in derogation of the common law, must be strictly construed—unless, perhaps, a lenient interpretation will effectuate its beneficent purpose rather than bring in its train results more harmful than the remedy sought to be achieved by its enactment. The recognized intent of the

9. As more fully discussed in section (c) infra, the primary attempted justification for fair-trading the package is the claim that the purchaser relies upon the implicit guaranty "that the quality of the article in question is the same as previous articles which bore the same mark."

10. Note: Fair Trade Acts—In General—Package Containing Non-Fair-Traded Items cannot be Fair-Traded, 69 Harv. L.Rev. 385 (1955); Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 1936, 299 U.S. 183, 193, 57 S.Ct. 139, 144, 81 L.Ed. 109:
"The primary aim of the law is to protect the property—namely, the good

will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself."

11. The Goody case upheld the fair-trading of trademarked long-playing records although the standard 78 r. p. m. records were not fair-traded. The decision was based upon the theory that the Fair Trade Laws gave the producer an independent choice as to each product. The Klein case cites Goody, and sees "no warrant for a contrary view in any provision of the statute." (121 N.Y.S. 2d at page 48).

statute is to enable a manufacturer to protect his good will by insulating his commodity from the competitive vicissitudes of the market place, Corey, Fair Trade Pricing: A Reappraisal, 30 Harvard Business Review, No. 5, p. 47 (1952). But a *sine qua non* to effectuating that purpose is, it seems to me, that the producer must sell the commodity under his brand or trademark and to have it price-fixed. In my view, it would frustrate that intent were protection of the statute afforded a manufacturer of a product (trademarked and fair-traded by him) who grouped with that article other items (branded but not fair-traded by him) and then labelled the assembled package with the trademark in question." [12]

A second application for preliminary injunction was denied in Eastman Kodak Co. v. Siegel, d/b/a Tower Photo Shop, 1955, 207 Misc. 986, 140 N.Y.S.2d 260. Steuer, J., characterized the previous decision as holding "that a manufacturer may only fair trade products of his own manufacture", (140 N.Y.S.2d at page 261), and stated his own view to be, (140 N.Y.S.2d at page 262):

"In this connection no objection can be seen to combining articles in a single offer providing all of them are products of the seller's manufacture, trade-marked by him and meet the requirements of being in free competition." [13]

 In the opinion of the court, while a manufacturer probably may effectively

fair-trade only some of its products, this should be done openly and directly. Fair-trading should not be attempted indirectly, by blanketing its non-fair-traded products with those it has fair-traded, and thus spread the mantle of protection over all components, by purporting to establish a unit or package fair-trade price. The effort so to do is held to be ineffective. The consequences will be considered in connection with the decision of the other points.

(c) Can defendant fair-trade a package containing articles manufactured by others, and not themselves fair-traded?

Plaintiff contends that its package, containing two articles manufactured and trademarked but not fair-traded by it, and two articles manufactured by others and not fair-traded separately, can itself be the subject of fair-trading. It was argued that the package becomes a "commodity", and where the container bears the Eastman trademark, the package is susceptible of being fair-traded as a unit.

Each of the parts can be purchased separately; in fact, Eastman furnishes a chart upon which the cost of each item is shown. The cost when purchased as a unit is no less than when purchased individually.[14] Each item had exactly the same utility, whether purchased separately or as part of the unit. If they were removed from the container, and mingled with stock items, it would be impossible to tell which was which. Nevertheless, Eastman contends that "the Kodak name and trade mark" actually sell the package; that "By put-

---

12. This portion of opinion approved in Harvard Law Review Note, supra, Note 10.

13. The injunction was denied because of the "close factual question" as to whether plaintiff had abandoned its fair-trade policy by granting a New York agency to Ritz Camera Center, which had a store in the District of Columbia (which has no Fair Trade Law) and which it was alleged regularly sold plaintiff's products in Washington, D. C., and accepted and filled mail orders for the sale

of such products, at prices below plaintiff's established fair-trade prices.
This court is advised that the case was tried on the merits in April 1955 and fully briefed; no decision had been announced when this opinion was filed. For the decision therein see Eastman Kodak Co. v. Siegel, Sup., 150 N.Y.S.2d 99.

14. The cost of the outfits is greater by 1¢–48¢ than the cost of the items purchased separately. No figures were given as to the cost of manufacturing the cardboard carrier, which is not fair-traded, and is not sold as an independent item.

ting its name and trade-mark on the carton, the Plaintiff has legally, as well as practically, insured that people will rely upon the Eastman name in purchasing the outfit, regardless of the sources of its component parts"; and that it thereby becomes a "commodity". This court is unable to agree that the placing of unassembled parts in a container makes them anything other than what they were before—a series of articles whose utility is identical with what it was before packaging. Put them in; take them out; put them back—their nature, use, function and value is unchanged.

If it were true, as plaintiff argues, that an outfit "has a distinct usefulness to the retailer and consumer—quite independent of its component parts" (although its witness on this point would not undertake to testify that the package had greater utility than its components), this would prove too much. If the unit becomes a "commodity", independent of its components, the holding by the Federal Trade Commission, affirmed by the Second Circuit, 1946, 158 F.2d 592, certiorari denied, 1947, 330 U.S. 828, 67 S. Ct. 869, 91 L.Ed. 1277, that color film and magazine film were not in free and open competition and not the subject of fair-trading, would become practically nugatory. By placing them in a "package", their separate identity would be lost and merged in the new "commodity".[15]

Moreover, if the elements become a new commodity in the melting pot of packaging,[16] would there be any reason further to regard the previous fair-trade prices of those elements which had been independently fair-traded? Could not the fair-trade price of the commodity, if in fact new and different, be such that either the fair-traded, or non-fair-traded items, or both, could be sold at a total below their established market prices?[17]

Could not the manufacturer of a flash bulb assemble and fair-trade a package consisting primarily of Eastman products? More importantly, could not Home Utilities by a parity of reasoning "manufacture" a package by aggregating any pieces of photographic equipment, whether fair-traded or not, and itself fair-trade this wholesale at any price; or sell it at any price without fair-trading it? It would be no answer for Eastman to refer to paragraph 3 of its Retailer Fair Trade Agreement, forbidding the sale of Eastman products "in combination" with any other merchandise; for on Eastman's contention its outfit is a "commodity", and not a "combination" of camera, flash holder, bulbs, batteries, etc.[18]

15. This may in fact be Eastman's concept. It does not fair-trade its flash holders, because for at least some months after a new Eastman camera is placed on the market, only Eastman flash holders will fit it, and they are accordingly not in free and open competition. But the testimony was that outfits containing such new cameras and flash holders were placed upon the fair-trade lists as soon as marketed.

16. Are the bottles of liquors in a Christmas hamper any different from what they were before the package was assembled; and do they regain their pristine character when removed, unopened, from the hamper?

17. Eastman Kodak Co. v. Siegel, d/b/a Tower Photo Shop, 1955, 207 Misc. 986, 140 N.Y.S.2d 260, at page 262, Steuer, J.:

"It would seem that an abandonment could only be spelled out if plaintiff is permitting or consenting to an arrangement whereby the article can be sold in reality below the fair trade contract price. In this connection no objection can be seen to combining articles in a single offer providing all of them are products of the seller's manufacture, trademarked by him and meet the requirements of being in free competition. The fact that the fair trade price for the combination of articles is less than the total of the fair trade prices for the articles individually is not significant."

18. See Guerlain, Inc., v. F. W. Woolworth Co., 1947, 297 N.Y. 11, 74 N.E.2d 217, at page 218, that for a "new commodity" the "very form and character of the basic product [must be] altered"; "a new article, possessing a completely different function", must be created.

This court is in accord with the holding of Levy, J., in Eastman Kodak Co. v. Siegel, d/b/a Tower Photo Shop, 1955, 207 Misc. 283, 136 N.Y.S.2d 800, 805:

"In my view, too, the function of fair-trade legislation would be aborted were the producer warranted in claiming protection of the statute for a package in which he has assembled other articles manufactured by others and themselves not fair-traded and not bearing the producer's trademark. The provisions of the statute 'are wholly inapplicable to unmarked goods.' General Electric Co. v. Masters, Inc., 307 N.Y. 229, 238, 120 N.E.2d 802, 804.

"Moreover, to enable the owner of a trademark to use his registered brand in connection with the sale of a package containing a number of component parts, some of which are produced or owned by the seller and carry his trademark, and others of which are not produced by him, do not carry his trademark and individually and independently are not fair-traded, might facilitate a practice not at all within the meaning of the Act and might result in unlimited vices in commerce and difficulties in law enforcement. In the end, the price-fixed tail might be permitted to wag the unbranded and non-fair-traded dog. The result might be that the statute would protect not the trademark or the fair trade, but rather the unmarked and the unfair. It seems clear to me that the statute was intended to protect the fair-trader, not the free-loader. And the problem before me is not what the statute might provide, but rather what it does provide. If the Legislature intended to permit the manufacturer of one or two articles to brand, trademark and price-fix them, and with that as a peg to be able to include these articles in a package containing any number of other items—not themselves branded, trademarked or price-fixed—and then to price-fix the whole package, the statute should clearly and unmistakably so provide." [19]

The court is of opinion that Eastman cannot effectively fair-trade its camera outfits, containing non-fair-traded items, whether of its own manufacture, or that of others.

It is therefore necessary to consider [20] what relief can and should be granted under the complaint, and the foregoing rulings.

Home Utilities argues that this court should have withheld decision, and should now withhold the passage of any decree, until the Maryland Court of Appeals has decided the appeal in Home Utilities Company, Incorporated v. Revere Copper and Brass, Inc., et al., No.

19. So far as the effect of the inclusion of products of other manufacturers is concerned, the opinion of Steuer, J., in the same case, 1955, 207 Misc. 986, 140 N.Y.S.2d 260, 262, supra, note 17, appears to be in accord.

The suggested analogy to radio and television sets in Note 69 Harv.L.Rev. 385–386 would not seem apt. Few people would buy a chassis, transformers, condensers and picture tubes separately, and attempt to make a radio or television set; just as very few would buy the component parts of an automobile, and expect to "manufacture" the finished product.

20. The evidence disclosed that plaintiff allowed its employees a discount on plaintiff's products. Defendant has made no point of this, possibly because of the language in Schill v. Remington-Putnam Book Company, 1941, 179 Md. 83, at page 95, 17 A.2d 175, at page 181, 22 A.2d 129, approving certain contractual exceptions, not including employee discounts, and saying: " * * * It does not appear that the Fair Trade Act precludes exemptions from the contract contemplated by its provisions, and we can see no logical objection to reasonable exemptions agreed upon by the parties to the contract", and General Electric Co. v. S. Klein-on-the-Square, Sup.1953, 121 N.Y. S.2d 37, 49, but to the contrary, see Bristol-Myers Co. v. L. Bamberger & Co., 1937, 122 N.J.Eq. 559, 195 A. 625, affirmed on opinion below, 1938, 124 N.J. Eq. 235, 1 A.2d 332.

147, October Term, 1955.* It is claimed that that appeal involves new and substantial questions under the laws and Constitution of Maryland. In that appeal Home Utilities claims that the Maryland Act is invalid:

(1) As an unconstitutional delegation to private persons, without adequate standards, of the legislative power to fix prices;

(2) The non-signer provision, as applied to Home Utilities, violates the requirements of due process of law; and

(3) The Act was void ab initio and that its invalidity was not cured by the passage of the McGuire Act.

These same points were unsuccessfully urged in the trial of the case in Circuit Court No. 2 of Baltimore City. Judge Cullen in that court, in an opinion filed August 2, 1955, held that the first two points were foreclosed by prior opinions of the United States Supreme Court and of the Maryland Court of Appeals. He ruled adversely to Home Utilities on the third point.

The general validity of the non-signer's clause was before the Maryland Court of Appeals in Goldsmith v. Mead Johnson & Co., 1939, 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339, in which the Maryland Act was upheld, and every subsequent case before the Maryland Court of Appeals has involved a non-signing retailer. The decisions in this district have recently referred to this and other decisions of the Maryland Court of Appeals as upholding the validity of the Maryland Act. General Electric Co. v. Home Utilities Co., D.C.D.Md.1955, 131 F.Supp. 838, 840, 841, affirmed per curiam, 4 Cir., 1955, 227 F.2d 384; Sun-

beam Corp. v. MacMillan, D.C.D.Md. 1953, 110 F.Supp. 836, 839–840.

■ While it does not appear that points (1) and (3) have specifically been passed upon by the Court of Appeals of Maryland, and while the position of Home Utilities with respect thereto has received some support,[21] this court in a suit founded upon diversity of citizenship should accept the decision of the Circuit Court No. 2 of Baltimore City. Lee-Wilson, Inc., v. General Electric Co., 1 Cir., 1955, 222 F.2d 850, 854.

The parties have argued for various forms of relief. Home Utilities contends that no injunction should issue against it, unless and until Eastman has "purged" itself by taking packages containing non-fair-traded items off the fair-trade list; or that this court declare that the items independently fair-traded, and included in such packages are no longer subject to fair-trade prices even if sold separately.

■ The court does not agree with either of these contentions, but will sign an order enjoining defendant from advertising or offering for sale, or selling, at retail, Eastman products at less than the minimum retail resale prices now or hereafter stipulated by Eastman in its "Schedule of Products and Minimum Prices" pursuant to the provisions of Eastman's Retailer Fair Trade Agreement; provided, however, that such injunction shall not be applicable to outfits, "packages" or aggregations which include any item (a) manufactured by Eastman and not independently and separately fair-traded by it; and/or (b) manufactured by others than Eastman.

* See 122 A.2d 109.

21. Note: The Operation of Fair-Trade Programs, 69 Harvard L.Rev. 316, 318, n. 24; 349, n. 184; 350, notes 186–188

(1955); Fulda, Resale Price Maintenance, 21 U.Chicago L.Rev. 175, 209, 210, notes 172–174 (1954).